**UNITED STATES**

v.

**Master Sergeant Jack L. SAUL, FR 301–46–5343, United States Air Force.**

**ACM 25736.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 13 June 1986.

Decided 25 April 1988.

---

Appellate Counsel for the Appellant: Vaughan E. Taylor, Jacksonville, North Carolina, Colonel Leo L. Sergi and Lieutenant Colonel Patrick C. Sweeney.

Appellate Counsel for the United States: Colonel Joe R. Lamport, Lieutenant Colonel Robert E. Giovagnoni and Major Kathryn I. Taylor.

Before SESSOMS, LEWIS and BLOMMERS, Appellate Military Judges.

## DECISION

BLOMMERS, Judge:

Despite pleas of not guilty, the appellant was found guilty following a trial before members of six specifications alleging various forms of sexual misconduct with his natural daughter, D. Included were three specifications of indecent liberties, two specifications of sodomy with a child under the age of 16 and a specification of assault with intent to commit rape. The offenses occurred between March 1983, when the appellant and his family were first assigned to Hawaii, and January 1986. The victim was 12 years old when this period commenced and was a month short of age 16 by the time of trial. The military judge instructed the members that the maximum punishment consisted of a dishonorable discharge, confinement for 81 years, forfeiture of all pay and allowances and reduction to airman basic. The sentence as adjudged and approved is a dishonorable discharge, confinement for 40 years and reduction to airman first class. The appellant was represented at trial by a detailed military counsel and a retained civilian

counsel, neither of whom continue to represent him on appeal. Appellate defense counsel have assigned six errors. We find that three of the assigned errors merit discussion in addition to two other issues which have been identified during the course of appellate review.

I

During an Article 39(a) proceeding prior to the initial session with members, the trial counsel advised the military judge that the prosecution intended to elicit testimony from the victim concerning sexual misconduct by the appellant starting from the time that the victim was about five years old, at least seven years before the period covered by any of the specifications. The trial counsel argued that the testimony was relevant and admissible in light of several of the enumerated exceptions in Mil.R. Evid. 404(b) and furnished a 15 page brief in support of his contention. When queried by the military judge, the civilian counsel, while not challenging the admissibility of the proposed testimony, asked that the military judge exclude it as "extremely inflammatory and prejudicial." Mil.R.Evid. 403. The military judge ruled that the testimony could be presented.

When called by the prosecution, D. testified to a pattern of abusive sexual behavior by her father commencing when she was four or five years old and the family was living in South Carolina. Included were descriptions of various acts of fondling, fellatio and cunnilingus. D. indicated that her father often made her promise not to tell anyone what had occurred. Occasionally, she testified, he threatened her with physical violence, by wielding a belt in at least one instance, if she refused to accede to his demands. She described beatings with a wooden paddle that she and her younger brother received from her father, although she did not directly tie this behavior with the sexual misconduct. She was shown pictures of nude people on motorcycles, and described posing nude on a motorcycle herself while the appellant masturbated in her presence. One incident vividly described involved the appellant's penetrating her vagina from behind with his penis while she was kneeling on the floor at his command. D. recalled bleeding, becoming frightened and crying. She testified that her father had her sit on a warm washcloth until the bleeding ceased. She indicated her father often abused her when they went fishing together. She noted that on such occasions he would have a jar of Vaseline and a washcloth in his possession.

D.'s testimony as to the acts covered by the specifications described a somewhat similar pattern of behavior. She was shown some dirty pictures and asked by her father if she'd like to try it (referring to various forms of bondage and sexual acts depicted). She said that her father, as a pretext, would take her out for driving lessons. On one occasion he drove to an isolated road adjacent to an industrial park. He parked the car, disrobed her, and forced her down on the seat, saying "Now it's time to fuck." When she resisted, he slapped her. Although no act of intercourse was consummated, this episode was the basis for the charge of assault with intent to commit rape. She vividly described another incident when the appellant took her to a building in downtown Honolulu where he had worked as a security guard. According to her testimony, she was attacked and thrown to the ground by the appellant who pulled her pants down and inserted two fingers in her vagina following a struggle. She noted on this particular occasion that the appellant had a paper bag from which he pulled a jar of Vaseline and a washcloth during the struggle. After this incident the appellant gave her a 20 dollar bill and suggested that would make her feel better. Disgusted, D. threw the money away. On occasions when she was successful in getting her father to stop an assault, she indicated he would often spread her legs apart and masturbate while gazing at her vaginal area. In January 1986, D. testified the appellant came into her room in his underwear and got into bed with her. He tickled her and rubbed her chest. When she told him to stop, he told her not to tell anyone he had raped her because she didn't know the difference between that and playing. If she

told, he'd show her the difference. These incidents came to light early in 1986 when D. made an unsuccessful attempt to leave Hawaii with two school friends. The mother of one of her friends became aware of the situation and confronted the youths in the vicinity of the commercial airport. D., thoroughly frustrated and confused at this juncture, confided in her friend's mother. The matter was quickly reported to military authorities.

The military judge instructed the members as follows:

> .... [T]he matters testified to by [D.] prior to 13 March 1984, concerning the offenses in Charge II and prior to 13 March 1983 concerning the offenses in Charge I, may be considered by you for the limited purpose of its tendency if any, to show the intent of the accused, the accused's motive or plan or the opportunity to commit the offenses. The extent to which the evidence proves or tends to prove any of these things is a matter within your sole discretion. You may not consider this evidence for any other purpose and you may not conclude from this evidence that the accused is a bad person and that he therefore committed the offenses charged.

Perhaps no evidentiary issue has been the subject of more confusion and seemingly contradictory approaches at the appellate level than the admissibility of uncharged misconduct under Mil.R.Evid. 404(b). Indeed, much has been written, if not entirely clarified, on this matter since this case was tried in June 1986.

■ Based on our review of the entire record, we do not find that the military judge erred to the appellant's substantial prejudice in admitting the victim's testimony of a course of sexual contacts with her father which commenced well before the period set forth in the specifications.[1] *United States v. Beechum*, 582 F.2d 898 (5th Cir.) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1978); *United States v. Wilkes*, 685 F.2d 135 (5th Cir.1982); *United States v. Clark*, 15 M.J. 974 (A.C.M.R. 1983), *pet. denied* 17 M.J. 16 (C.M.A. 1983), as it pertains to an accused's mental disposition and Mil.R.Evid. 403 balancing analysis; *United States v. Woodyard*, 16 M.J. 715 (A.F.C.M.R. 1983), *pet. denied* 17 M.J. 204 (1983); *United States v. Hinote*, 1 M.J. 776 (A.F.C.M.R. 1976). It is arguable, of course, that the defense waived any claim of error by grounding the objection to the testimony in Mil.R.Evid. 403 rather than 404(b), the latter speaking directly to admissibility, or nonadmissibility, of evidence of other crimes, wrongs or acts. An objection based on Mil.R.Evid. 403, on its face, recognizes that the proffered evidence is "relevant," but should be excluded because its probative value is substantially outweighed by the danger of unfair prejudice to the objecting party. The military judge properly considered the basic relevancy of the testimony even though this issue had not been raised by trial defense counsel. Recent language by the Court of Military Appeals suggests that the evidence of the appellant's sexual relationship with his daughter was probative of a general scheme or plan to use his position of authority "to orchestrate events" to obtain sexual gratification through physical contact' with his daughter. *United States v. Hicks*, 24 M.J. 3, 7 (C.M.A. 1987), citing *Oliphant v. Koehler*, 594 F.2d 547, 553 (6th Cir.1979). The testimony was offered largely for this purpose, and the military judge's instruction to the members was consistent with its consideration in this context.

Additionally, our research reveals that evidence of prior misconduct with an incest victim has long been admitted as a matter of routine in numerous state jurisdictions. *See* Annotation, *Evidence—Similar Sexual Offense*, 77 A.L.R.2d 841, 878–881 (1958).[2]

---

1. We note that during oral argument before this Court, appellate defense counsel conceded the admissibility of D.'s testimony about acts of abuse pre-dating the charged offenses.

2. One theoretical basis for admission of such evidence is to develop the lustful and lascivious relationship existing between the parties. 77 A.L.R.2d at 878. Indeed, common sense would tend to rebel at the thought that a father who enjoyed a "normal" relationship with his natural

Even if we were to assume that the military judge erred in admitting testimony of the earlier acts of sexual misbehavior, this record would provide no basis for our concluding that the admission had prejudiced the appellant on findings. It was clear from the outset that this was to be a fully litigated case. Unless the defense had decided to stand moot before the allegations and not respond in any manner, even cross-examination of government witnesses, the door to the admission of the prior acts would have inevitably been opened. For example, the cross-examination of the victim was obviously designed to portray her as one who had likely fabricated the allegations because of the emotional turmoil she was experiencing in her home and school environment. To underline this point, defense counsel emphasized that the victim had numerous earlier opportunities to report the sexual abuse to trusted relatives but that she had not done so. Surely, this attack on the victim's credibility would have enabled the prosecution to counter by showing that the sexual abuse represented the norm of her relationship with her father back to the time of her earliest conscious memory and, thus, no particular incident gave rise to an impetus on her part to report the matter. In summary, we do not find that the appellant's interests were unfairly damaged by the members' consideration of D.'s full testimony of the dimensions of the relationship.[3]

## II

In a related evidentiary issue, trial defense counsel filed a motion asking the military judge for a "preliminary ruling" that would prohibit the government from using or making reference to any evidence concerning the appellant's alleged assault with a deadly weapon and violent rape of an adult woman in South Carolina some eight years prior to this trial in rebuttal to any character evidence put on by the defense. *See* Mil.R.Evid. 405. Criminal proceedings on those charges in the South Carolina courts resulted in two mistrials, and ultimately the charges were dismissed. Defense counsel argued that since there was no conviction the government should be barred from presenting any impeachment-type evidence regarding this incident, and furthermore that its probative value would be substantially outweighed by the chances of unfair prejudice. Mil.R.Evid. 403. Trial counsel countered that any ruling at that point would be premature, and that the government did not intend to offer any such evidence in its case-in-chief. The military judge, citing *Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948), denied the defense motion, indicating that he could not determine at that point in the trial that such evidence would be per se inadmissible, but that the defense could certainly object if such evidence was offered at a subsequent point in the proceedings.

It is now asserted that this preliminary ruling constituted plain error in a case where the appellant's character was a central issue at trial. The defense did not call any character witnesses during the findings portion of the trial. That the defense strategy may well have been affected by this ruling does not, of course, standing alone, constitute error. Under *Michelson*, and our present rules of evidence, "do you know" or "have you heard" type questions, including reference to specific instances of conduct, are a recognized method of testing a witness' opinion concerning the character or a trait of character of a person, presuming there is a good faith basis for asking the question and it is otherwise admissible under our rules of evidence (which in most cases would include a Rule 403 balancing analysis). *See* S. Saltzburg, L. Schinasi & D. Schlueter, *Military Rules of Evidence Manual*, 381–82 (2d Ed. 1986). Nor do we

---

daughter might suddenly find her sexually attractive and be inclined to become physically aggressive with her.

**3.** We believe, however, that the far wiser practice is for the prosecution to hold this type of extrinsic offense evidence in abeyance, or the

trial judge decline to admit it until an issue such as the accused's motive, intent or plan is actually in dispute. *See, e.g., United States v. Mann*, 26 M.J. 1 (C.M.A.1988); S. Saltzburg, L. Schinasi and D. Schlueter, *Military Rules of Evidence Manual*, 361–62 (2d Ed.1986).

find that the absence of a conviction would necessarily preclude the admission of evidence of the underlying conduct. *See United States v. Cuellar*, 22 M.J. 529 (N.M.C.M.R. 1986) and cases cited therein. As the Court of Military Appeals has stated: "The Government must first demonstrate that the bad acts are relevant to some aspect of its case. It may well be that the materiality of such evidence will not arise until . . . the accused asserts that he is innocent due to lack of criminal intent or other affirmative defense." *United States v. Brooks*, 22 M.J. 441, 444 (C.M.A. 1986). The point being, the military judge had no crystal ball by which to gauge what would develop as the trial proceeded. We conclude that the ruling by the military judge did not constitute an abuse of discretion on his part. *United States v. Hicks, supra; United States v. Woodyard, supra.*

### III

■ Appellant claims that he received inadequate representation by his defense team at trial. In support of this contention, 23 separate allegations of defense shortcomings in the preparation and presentation of the defense case have been detailed. Among these are the failure of the defense counsel to prepare briefs and argue more diligently to exclude extrinsic offense evidence which has been discussed above; failure to seek dismissal of offenses occurring off a military installation for lack of subject matter jurisdiction despite the favorable nature of Air Force precedents at the time of trial; failure to proceed diligently to obtain evidence from character witnesses; failure to adequately prepare the testimony of a defense witness, Master Sergeant Webb, to establish that he had previously purchased from the appellant an automobile described by the appellant's daughter in conjunction with the attempted rape charge; failure to interview the daughter's teachers concerning her declining performance in school or to introduce a poor report card she received the day prior to running away from home; failure to investigate or effectively exploit the lack of medical evidence to corroborate the daughter's testimony; and, the failure to seek a multiplicity ruling, particularly with respect to the attempted rape and an indecent liberties specification, both of which described acts which were part of a single course of conduct at the same time and place. Posttrial affidavits and other documents from the appellant and his appellate counsel, as well as affidavits from civilian counsel and detailed military counsel who represented him at trial, have been submitted for our consideration on this issue.

In assessing claims of ineffective assistance of counsel, military courts utilize the standard for review set out by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *United States v. Scott*, 24 M.J. 186 (C.M.A.1987); *United States v. Mansfield*, 24 M.J. 611 (A.F.C.M.R. 1987).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687, 104 S.Ct. at 2064. Thus, to prevail on a claim of ineffective assistance of counsel, the appellant must establish both incompetence and prejudice. With regard to competence, the Court of Military Appeals has stated:

> The competence of counsel is presumed. To make out a claim of ineffective assistance of counsel, the accused must rebut this presumption by pointing out specific errors made by his defense counsel which were unreasonable under prevailing professional norms. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances.

*United States v. Scott, supra,* at 188. With regard to prejudice, the Court said that "...even unprofessional errors by counsel do not justify setting aside a conviction unless the deficient conduct 'actually had an adverse effect on the defense.'" The Court concluded:

> The test for prejudice when a conviction is challenged on the basis of actual ineffectiveness of counsel 'is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' *Strickland v. Washington, supra* [466 U.S.] at 695, 104 S.Ct. at 2068–69. This requires a court to consider the totality of the evidence before the factfinder.

*Id.* at 189.

Based upon the entire record, we conclude that the appellant has not shown that he was ineffectively represented at trial under the above set forth standard. Yes, other counsel may have done some things differently or been more thoroughly prepared to meet some of the issues that one could reasonably have expected would arise during the trial. Of the 23 separate allegations of defense shortcomings, only two appear to fall below the "prevailing professional norms": failure to thoroughly investigate D.'s declining performance at school through interview of teachers and counselors to support the defense theory of fabrication of the charges in retaliation for appellant's placing restrictions on her due to her falling grades (most of this information was brought before the court during defense counsel's cross examination of D.); and, failure to discover whether or not any physical evidence of D.'s alleged abuse existed. We certainly agree that pretrial investigation is perhaps the most critical stage in the criminal justice process. *House v. Balkcom,* 725 F.2d 608 (11th Cir. 1984); ABA Standards, The Defense Function, Standard 4–4.1 (2d Ed. 1979). Most of the other alleged shortcomings appear to involve tactical decisions on counsels' part or were based upon a correct interpretation of the law. Even if we view the first prong of the *Strickland* test for ineffectiveness as having been met, the second prong clearly has not. The appellant received a fair trial. We see no "reasonable probability" that even the most able of criminal defense lawyers would have achieved any different result.

### IV

■ Another issue pertaining to "counsel" was identified on appellate review. Due to apparent oversight, the appellant was not advised at trial of his rights to counsel in accordance with R.C.M. 901(d)(4)(A) which incorporates the requirement as enunciated in *United States v. Donohew,* 18 U.S.C.M.A. 149, 39 C.M.R. 149 (1969). *See also* Article 38(b), U.C.M.J. When the initial session of trial was held on 3 June 1986, the appellant was not present, although both his counsel and all other parties detailed were. The appellant was hospitalized following a suicide attempt or gesture.[4] During this session the court ordered a sanity inquiry. When the court again met on 11 June 1986, the appellant and all other parties were present. A newly detailed military judge was presiding. He neglected to advise the appellant of his counsel options. The appellant, in a statement filed with this court, avers that he was unaware he had a right to request a military counsel of his own choice and that he would surely have done so if he had been properly advised. Detailed military counsel has filed an affidavit stating that she advised the appellant of all his options with respect to counsel at an early point in their professional relationship.[5] *See* R.C. M. 502(d)(6), Discussion (A). The Article 32 Investigating Officer filed an affidavit stating that he also advised the appellant of his counsel rights, including the right to re-

---

4. Whether the appellant, in fact, attempted suicide in a fit of depression or whether he made a suicidal gesture designed to discourage his daughter from testifying became a contested factual issue at trial.

5. Owing to the attack by the appellant on the adequacy of his counsel, his detailed counsel at trial is not constrained in this matter by the attorney-client privilege. *See* Mil.R.Evid. 502; *United States v. Devitt,* 20 M.J. 240 (C.M.A.1985).

quest a military lawyer of his own selection, at an appropriate time in that pretrial proceeding. We also note from the record that the appellant entered the Air Force in March 1966, thus he had just over 20 years of service at the time of trial. We can presume he has reenlisted several times. Article 137 of the Uniform Code, 10 U.S.C. § 937, requires that upon entering the service, six months thereafter, and upon reenlistment certain articles of the Code will be carefully explained to all enlisted members. Included is Article 38, 10 U.S.C. § 838, which contains an accused's right to counsel options. These statutory provisions have been a part of military law since the Uniform Code of Military Justice was first enacted in 1950.

 There is no doubt that the omission of a counsel rights advisement at trial constitutes error. *United States v. Donohew, supra.* But does it rise to the level of plain or prejudicial error in this case? We think not. U.C.M.J., Article 59(a), 10 U.S.C. § 859(a). It is obvious the appellant was aware that he had a right to be represented by civilian counsel and detailed military counsel, since those were the counsel who represented him at trial. Based upon a review of all matters submitted by appellate counsel, we are convinced that the appellant was equally aware that he had the right to request a military lawyer of his own selection, despite his protestations to the contrary, and that his selection of counsel was, at the time, knowingly and voluntarily made.[6] We note that no claim of dissatisfaction with the right to counsel options chosen (to be considered separate from the complaints about the performance of the individual counsel involved) was made until the issue was raised by this Court. As Judge Cox stated in his concurring opinion in *United States v. Johnson,* 21 M.J. 211 (C.M.A.1986): "There is a difference between denying an accused the right to counsel and failing to advise, or misadvise, an accused as to that right. As to the latter, I do not believe reversible error necessarily results." *Id.* at 217.

**V**

 The final subject we will address is appropriateness of sentence. The appellant was subject to a punishment which included up to 81 years confinement, and, as noted above, the court adjudged 40 years. While there is perhaps no type of offense more repugnant in our society or indicative of depraved morals than child sex abuse involving one's own offspring, we recall no Air Force case for such offenses which includes confinement for that lengthy a term. Bearing in mind that an accused can only be punished for the offenses upon which findings of guilty have been returned, and considering the entire record, we find appropriate only so much of the sentence as extends to a dishonorable discharge, confinement for twenty-eight (28) years and reduction to airman first class.

We find the remaining assignments of error to be without merit. *United States v. Griffin,* 25 M.J. 423 (C.M.A.1988); *United States v. Cox,* 18 M.J. 72 (C.M.A.1984); *United States v. Rogan,* 19 M.J. 646 (A.F. C.M.R.1984). Accordingly, the findings of guilty and the sentence, as modified, are

AFFIRMED.

Senior Judge SESSOMS concurs.

Judge LEWIS (dissenting):

Were it not for the lack of a counsel rights advisement on the record in this case, I would find the findings and sentence to be correct in law and fact and would, therefore, affirm. However, I do not believe that the record, in its present state, rationally supports an inference that the appellant was fully aware of his counsel rights at the time of trial. Accordingly, absent further proceedings, the record is not complete.

As does the majority I look to *United States v. Johnson,* 21 M.J. 211 (C.M.A. 1986), as the current statement of military

---

6. Although our dissenting brother disagrees, we do not feel a *Dubay* hearing is necessary to resolve this issue, nor that such a hearing would add anything of substance to the information already available to this Court. *United States v. Dubay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967).

law relating to an inadequate counsel rights advisement. As I read *Johnson*, the *Donohew* rule remains more or less intact. In fact, the Court expressly declined an invitation by government counsel to overrule *Donohew*. 21 M.J., at 214. In so doing both participating judges, writing separately, endorsed the concept that an accused who pursues a counsel rights advisement error on appeal might be required to state in what manner he had been prejudiced. As Judge Cox stated: "It is not unreasonable for us to put the burden on the accused to say, through counsel, to the appellate courts that he is dissatisfied with the results in his case; that he wants a new trial or a different result; and that he tell us why." *Id.*, at 217. I believe that the appellant in this case has clearly satisfied this threshold burden.

The majority, I submit, deals with this issue in entirely too summary a fashion. Nothing I am able to glean from *Johnson* permits us to resolve the counsel rights issue based on a review of post-trial affidavits. If we follow the suggestion by the Court of Military Appeals in inviting the appellant to state how he was harmed and, then, summarily dismiss his averments as not worthy of belief, we are engaging in "Catch 22" logic rather than dealing seriously with a meaningful appellate remedy. *Johnson* also suggests, and rather strongly I believe, that development of the facts necessary for a fair adjudication of the counsel rights issue might well be accomplished by a limited *DuBay* hearing directed by us. 21 M.J., at 215–216. Since the majority has not deemed it necessary to so direct, we should look at what the record tells us to support a conclusion that the appellant was aware of his right to individual military counsel at the time of trial.

What are we to make of the appellant's averment that had he been aware of his right to request individual military counsel he would surely have done so in view of his dissatisfaction with his civilian counsel and his assigned military counsel? Is the statement self-serving? Of course, it is. Any statement designed to meet the threshold showing of prejudice test suggested by Judge Cox would necessarily be self-serving. By the same token, the counter-affidavits of the appellant's detailed military counsel and the Article 32 Investigating Officer have self-serving aspects as well. If the detailed counsel had acknowledged that she failed to advise the appellant of his rights to counsel, this would be an admission that she neglected a defense counsel responsibility outlined in the Manual. R.C.M. 502(d)(6), Discussion (A). The Article 32 Investigating Officer, from a reading of his affidavit, had a similar responsibility implicit in a checklist he was using at the time he convened the investigation. I do not make these observations in any attempt to discredit the statements of either party, but merely to demonstrate that an appellate review of affidavits, without benefit of confrontation and cross-examination of live witnesses, is a poor way to resolve contested factual issues. *See* Chief Judge Everett's discussion in *Johnson, supra*, 21 M.J., at 215.

Let us for the sake of argument view this matter in the manner most favorable to the government and accept the counter-affidavits as true. Does this clearly resolve the issue of the appellant's knowledge of his counsel rights at trial? In my view, it does not. If the two counter-affidavits are true, the appellant has misstated, falsely overstated, or forgotten certain material facts relating to his knowledge of his counsel rights. Whatever the case, the counter-affidavits do not clearly address the issue of what the appellant's knowledge was with respect to choice of counsel options at the time of trial. Several questions arise. If the appellant was advised at two distinct pretrial junctures as to his rights to counsel, was it reasonable for him to assume by virtue of these prior advisements that his right to state a preference for counsel extended up to the point of actual trial? On the other hand, might the lack of advisement at trial have supported an inference on his part that the time for exercising counsel options had passed? Was the appellant's mental and emotional state at trial such that he was consciously considering such matters without the reinforcement of a fresh advisement? The ap-

pellant was facing grave charges involving alleged acts of sexual misconduct against his natural daughter when he appeared in court. He had little more than a week earlier been admitted to a military hospital following a suicide attempt or gesture. What can we reasonably infer was going through his mind during this terrible, traumatic period? Was he consciously evaluating his options? Did he even understand what his options were? I do not believe the record answers these questions for us.

May we rely upon any particular assumption of knowledge by the appellant because he was a senior noncommissioned officer who had undoubtedly attended briefings on the Uniform Code of Military Justice? I hesitate to do so. I suspect that all personnel learn quite early in their careers that an accused has a right to retain a civilian counsel if he or she faces a court-martial. Regardless of how many times one is briefed, I would also suspect that the right to request individual military counsel is somewhat less well known in the general military community and is likely to fade from one's consciousness without reinforcement at an appropriate time. *Donohew* presupposes that all members brought before a court-martial require an advisement in court to eliminate uncertainty and to make it clear to all concerned that each accused has received proper advice. 39 C.M.R. 149, 152. Surely, given the magnitude of penal and emotional jeopardy which Master Sergeant Jack L. Saul faced on his initial day in court, he was an accused who required the fullest knowledge and understanding of his counsel rights. Can we be certain from this record that he had the benefit of such knowledge and understanding? Apparently the majority is sufficiently satisfied in this regard. I am not.

Is the appellant's claim of prejudice preposterous on its face? I don't believe that question can be answered affirmatively with any degree of assurance. The appellant's claim that he was dissatisfied with the apparent preparatory efforts of his two counsel at trial is not a new averment which suddenly ripened in the light of the discovered counsel rights advisement deficiency. It is entirely consistent with his prior statements in support of his claim of inadequacy of counsel. While not directly applicable to the issue before us, it should be noted that the appellant's misapprehensions concerning the quality of legal representation he was receiving were not entirely without merit. This much is clear from the majority's analysis of the adequacy issue. If the appellant is playing the opportunist, he is at least not contradicting that which he had already placed before us before the counsel rights advisement issue arose. The record provides no basis for us to summarily dismiss his claim.

Has appellate insistence in the past for a counsel rights advisement in court been an example of form elevated over substance? *See* Chief Judge Everett's discussion in *Johnson, supra,* 21 M.J., at 214. When we sat for oral argument in this case we posed a question of this general nature to the appellant's civilian counsel. His response was noteworthy. To paraphrase, there is undeniable value in the military judge's posing the counsel rights inquiry to an accused in open court. In terms of what the written transcript shows us at the appellate level there is seldom a major variance in such inquiries from one case to another. We can come to view this inquiry as a quaint and somewhat anachronistic ritual. However, an experienced military judge, having eye to eye contact with an accused, can normally determine whether such individual is evincing a true understanding of his counsel options. *See* Chief Judge Everett's further discussion along this same line in *Johnson, supra,* also at 214. Problems can be resolved before they occur and become appellate issues, some of which may by then not be capable of being resolved. Regardless of what we say or what the Court of Military Appeals may eventually say on the precise issue before us, there is no substitute for doing it right the first time at the trial level.

What, then, should this court do at this point? In my view, we should attempt to perfect an incomplete record concerning the appellant's knowledge of his counsel rights at trial. I am uncomfortable with a *DuBay* hearing when its purpose is to at-

tempt to recreate trial history as opposed to exploring an issue outside the trial record which might have had an impact on a given case. *United States v. DuBay,* 17 U.S.C.M.A. 147, 37 C.M.R. 411 (1967) (allegations of command influence which might have affected results of Army courts-martial). I am also concerned when a limited hearing is such as to create a potential conflict for a defense counsel in his roles as advocate for an accused and as an officer of the court. I do not perceive any problem with respect to the second issue in this case. Since I could affirm the findings of guilty in this case but for the counsel rights problem, I would order a *DuBay* hearing to consider evidence relevant to the question of the appellant's knowledge of his right to request individual military counsel at the time of trial. This is the type of case which should not be retried unless the ends of justice absolutely require that it be done. I would not be prepared to set aside the findings and sentence and authorize a rehearing without first making an attempt to perfect the record.

I concur in Parts I, II and III of the majority opinion.